# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THEODORE R. LUCAS,

     **Plaintiff,**

     **v.**

**MARGARET SPELLINGS,**
**Secretary, U.S. Department of Education.**

**Civil Action No.  01-2393 (JMF)**

## MEMORANDUM OPINION

### Introduction

By my Order of September 28, 2004, I demanded that plaintiff's counsel, John F. Karl, Jr. ("Karl"), show cause why he had not violated Federal Rule of Civil Procedure 11(b)(3) in making certain factual contentions in the documents he submitted on behalf of his client in opposition to <u>Defendant's Motion for Summary Judgment</u> ("Defs. MSJ").

Karl has retained counsel, Stephen C. Leckar, who has entered his firm's appearance as "attorneys for John F. Karl, Jr."  Mr. Leckar has filed, on his client's behalf, a <u>Response to Order to Show Cause</u> ("Plains. Response").

### Outline of This Opinion

In this memorandum, I will first explain why I believe that Karl's behavior must be judged by an objective standard: whether any reasonable lawyer, familiar with the record, would have made the statements he did.  I will then review each of the statements I identified in my first

opinion[1] in light of Karl's Response and indicate why I have finally concluded that they

constitute violations of Rule 11.  Finally, I will describe the sanctions I am imposing and indicate

why I believe they are adequate and proper.

### Controlling Legal Standard: An Objective Standard

In applying the pre-1983 version of Rule 11, "the courts generally followed a somewhat

nebulous standard of subjective good faith." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL

PRACTICE § 11App.101[2] (3d ed. 1997).  Following the 1983 amendments, however, the lawyer

who signs the document now certifies that to the best of his knowledge, information, and belief

formed after reasonable inquiry that, *inter alia*, the allegations and other factual contentions in it

have evidentiary support. Fed. R. Civ. P. 11(b)(3).  "This provision established an objective

standard of conduct." MOORE ET AL., supra, § 11App.101[2].  Hence, when the Rule 11

proceeding is commenced by motion filed by one of the parties, the courts have, without

exception, held counsel to an objective standard of reasonableness. Bus. Guides, Inc. v.

Chromatic Commc'ns Enters, Inc., 498 U.S. 533, 549 (1991); Int'l Brotherhood of Teamsters v.

Ass'n of Flight Attendants, AFL-CIO, 864 F.2d 173, 176 (D.C. Cir. 1988); Westmoreland v.

CBS, Inc., 770 F.2d 1168, 1177 (D.C. Cir. 1985).[2]

At first, Karl seems to adhere to this standard in his Response to the Order to Show

---

[1] Karl takes comfort in the government's only speaking to six of the thirteen statements I identified in my Order to Show Cause and demands that the government's silence as to the other seven be deemed a concession that they are unobjectionable. Reply to Defendant's Response to Order to Show Cause ("Plains. Reply") at 3.  The government's not speaking to all of the statements does not relieve me of my obligation to consider all of them since I raised the question of the propriety of all of them *sua sponte*.

[2] Accord In re Pennie & Edmonds, 323 F.3d 86, 90 (2d Cir. 2003).

Cause.  He asserts that: (1) a brief dependent on facts that undermine its legal claims is sanctionable; (2) sanctions may not be imposed unless an allegation is utterly lacking in factual support, meaning, of course, that they may be if the allegation is utterly lacking in factual support; and (3) sanctions are warranted if an attorney has presented an issue so meritless that no attorney would have presented it to the court. Plains. Response at 9-11.  These assertions describe an objective standard, one based on an evaluation of the record that does not factor in an attorney's subjective intent.  Nevertheless, Karl then demands that he not be sanctioned unless there is a showing of bad faith. Plains. Response at 2.  By this, I take Karl to be arguing that even if the court finds that his behavior was objectively unreasonable and beneath the standard of what a reasonable lawyer would have done, he should still not be sanctioned because there is no showing of a malicious intent; he was, at most, merely careless.  Karl's arguments meld principles that must be kept separate because, if not, they blur the fundamental distinction between the court's exercise of its inherent authority to punish misbehavior and its invocation of the sanction power granted it by Rule 11.

### Inherent Authority

The court has inherent authority to punish misbehavior that occurs before it even if a statute or rule is not applicable. Chambers v. Nasco, Inc., 501 U.S. 32, 43-46 (1991).[3]  The exercise of this power is subject to the requirement that it be based on a showing of bad faith. United States v. Wallace, 964 F.2d 1214, 1219 (D.C. Cir. 1992).  See Shepherd v. American Broad. Cos., Inc., 62 F.3d 1469 (D.C. Cir. 1995).  Furthermore, the sanction imposed must be

---

[3] If a statute or rule is applicable, resort to the court's inherent authority should occur only if the statute or rule is not "up to the task." Id. at 50.

carefully calibrated and be no greater than necessary to achieve the purpose that animates its exercise, such as deterring others from engaging in similar behavior. Bonds v. District of Columbia, 93 F.3d 801, 808-13 (D.C. Cir. 1996); Shepherd, 62 F.3d at 1478-80.

### Authority under Rule 11

When, on the other hand, the court is not relying on its inherent power, but on a specific rule or statute, that rule or statute defines the circumstances that trigger its application.  There is, therefore, a clear distinction between the court's inherent power to punish the bad faith affront to the court's authority and the power granted the court by Rule 11 to punish *inter alia* allegations in a document filed with the court in which "factual contentions lack evidentiary support." Fed. R. Civ. P. 11.  Exercise of the court's inherent authority requires the conclusion that the offending party or lawyer acted in bad faith while exercise of the power granted the court by Rule 11 requires instead a determination as to whether, judged by the standard of a reasonable party or lawyer, the party or lawyer offended one of the rule's provisions.  In this case, I have never asserted any inherent authority to punish Karl independently of Rule 11 but have premised and will continue to premise my authority to punish him solely on Rule 11.  Karl's resort to cases that deal with the court's inherent authority to punish misbehavior and the requirement that bad faith be established therefore have nothing to do with Rule 11, which, as I have just indicated, is based upon an objective evaluation of the lawyer's conduct.

### The Pennie Decision

Karl relies on the Second Circuit's decision in Pennie v. Edmonds, 323 F.3d 86 (2d Cir. 2003) for the proposition that the bad faith standard applies to Rule 11 sanctions that are imposed *sua sponte*. Plains. Response at 5-6.

First, Pennie is, by its own terms, expressly limited to the situation before it, *i.e.*, the invocation of a *sua sponte*, Rule 11 power to punish a lawyer by having him pay large legal fees long after the litigation had ended. Pennie v. Edmonds, 323 F.3d at 91-92.

In this case, since the issue was raised *sua sponte* by the court, attorneys fees are not available as a sanction. Fed. R. Civ. P. 11(c)(12).  See Johnson v. Waddell & Reed, Inc., 74 F.3d 147, 152 n.3 (7th Cir. 1995).  Additionally, the issue of Rule 11 sanctions in this case was raised contemporaneously with the submission of the subject document and therefore the Second Circuit's concern that the *sua sponte* imposition of sanctions after litigation has ended would chill aggressive advocacy is either not present or not as present as it was in Pennie.

Furthermore, another Circuit has now indicated that it specifically disagrees with Pennie's conclusion that the standard by which a violation of Rule 11 is judged is a function of how it is invoked.  In Young v. City of Providence, 404 F.3d 33, 39 (1st Cir. 2005), the First Circuit indicated that, contrary to Pennie, "[n]othing in the language of Rule 11(c) says that, if the court initiates the inquiry, something more than a Rule 11(b) breach of duty is required." Hence, a showing that the offending lawyer made a factual allegation without evidentiary support, in violation of Rule 11(b), sufficed even though her doing so was the product of nothing more than "culpable carelessness." Id.  Noting that there was nothing in the language of Rule 11(c) that "says that, if the court initiates the inquiry, something more than a Rule 11(b) breach of duty is required" the court rejected Pennie's conclusion that the standard should be a function of who invokes Rule 11. Id. at 39.  The court further noted that it was, after all, the purpose of the 1983 amendments to reject any bad faith requirement. Id. at 40.

Pennie has also drawn significant academic criticism.  The most authoritative

commentator in this area[4] has stated the following of Pennie's holding:

> This holding is irreconcilable with the text and history of Rule 11.
> Rule 11(c)(1)(B)-the provision authorizing *sua sponte* sanctions-
> does not create a separate standard for assessing sanctionable
> behavior. Rather, it incorporates the standard of Rule 11(b), which
> is uniformly interpreted as erecting an objective standard for
> assessing litigation conduct.

Gregory P. Joseph, '*Sua sponte* ' Sanctions, 25 NAT'L L.J. B6 (2003).[5]

## Objective and Subjective Standards and This Case

In any event, the distinction between an objective and subjective standard may be of

academic interest because the law has always inferred the intent with which an act was performed

from a consideration of all the circumstances surrounding its commission. For example, every

jury in a criminal case is therefore instructed as to the fundamental principle that a finder of fact

may infer the requisite intent from the surrounding circumstances, including the acts done, and

that it may infer that a person intends the natural and probable consequences of acts he has

knowingly done. D. C. Criminal Jury Instructions § 3.02 (4th ed 2002). Thus, as Joseph points

out, the dispute as to whether a subjective or objective standard is appropriate is "largely

semantic." Joseph, supra, note 6 at 213. He writes:

> When a court is called upon to determine whether the improper
> purpose clause has been violated, the court can do so only by
> inferring the presenter's intent from his or her objective behavior.

---

[4] See Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse (3d ed. 1994).

[5] Accord Jerold S. Solovy et al, Sanctions Under Rule 11: A Cross-Circuit Comparison,
37 LOY. L.A. L. REV. 727, 749 (2004) (insisting that Pennie rejects the weight of authority that
requires the objective reasonableness in all cases and ignores "the plain language of Rule 11").

Id. [6]

It is therefore legitimate for me to infer the intent with which acts are done from the manner in which they were done.

After careful review of the statements at issue, I have found numerous misstatements of fact, many of which are of the same type. As I will now explain, these statements are classic examples of inferences disguised as statements of fact. In my view, the nature of these misstatements and their repetition in Karl's discussion of various topics and subjects convinces me that they are not innocent mistakes or the product of mere sloppiness.

### Inferences Disguised as Facts

As I have just suggested, a classic misstatement is one in which an inference that might or might not be drawn from the facts is stated as a fact itself. To use a hoary example that trial judges are fond of, that a man walks into a room with a wet umbrella might permit the inference that the man was recently outside and that it was raining. It might also be true that the man decided to wash the umbrella. Given these facts, an advocate cannot first say "it was raining" but later, when challenged, explain that what was originally stated as a fact was actually only an inference that could have been drawn from the fact that the umbrella was wet. The statement, "it was raining" is objectively false. It asks the reader to believe that what is merely an inference that may be drawn from a set of facts is itself a fact.

Understandably, the courts have therefore specifically condemned a lawyer's presenting

---

[6] Note Joseph's citation of <u>Katzman v. Victoria's Secret Catalogue</u>, 167 F.R.D. 649, 661 (S.D.N.Y. 1996) ("The total lack of substance in the plaintiff's RICO claims and the egregious and unjustified neglect of the required statutory elements give rise to the inference that the action was filed for improper purposes."), <u>aff'd without opinion</u>, 113 F.3d 1229 (2d Cir. 1997).

as a fact what really is only an inference.  In <u>re: Curl</u>, 803 F.2d 1004, 1006 (9th Cir. 1986),

<u>overruled on other grounds by</u> <u>Partington v. Gedan</u>, 923 F.2d 686 (9th Cir. 1991).  Judge Noonan

quoted at length from the opinion of Chief Judge Vanderbilt in <u>In re: Greenberg</u>, 104 A.2d 46,

47-48 (1954):

> He may assert any inferences from the facts of the case that seem to
> him arguable, but he cannot present his inferences from the facts as
> if they were the very facts themselves. When he is indulging, as he
> has every right to do, in inferences or reasoning from the facts, he
> must say so–there are many words in the English language fitted to
> express this process of inference–and to be effective he should
> state the facts in the record from which he is making his inferences.
> A fortiori, if, as here, there are no facts on which to predicate a
> statement or from which he may reason or argue, he makes such
> false statement of facts or false inferences from such non-existing
> facts at his peril.

In <u>re: Curl</u>, 803 F.2d at 1006.  <u>Accord</u> <u>In re: Cent. Ice Cream Co.</u>, 836 F.2d 1068, 1073 (7th Cir.

1987); <u>Skycom Corp. v. Telstar Corp.</u>, 813 F.2d 810, 819 (7th Cir. 1987) ("A lawyer must

distinguish a fact from an inference he seeks to press on the court.  It is unprofessional conduct to

represent inferences as facts.").  <u>See</u> <u>In re: Kelly</u>, 808 F.2d 549, 551-52 (7th Cir. 1986) (lawyer

should not have stated inference as fact; should have let his reader determine what could fairly be

inferred from facts in lawyer's possession); <u>In re: Gen. Plastics Corp.</u>, 184 B.R. 996, 1006 (S.D.

Fla. 1995).

　　　As I will now demonstrate, Karl's statements obliterate again and again the distinction

between drawing an inference and stating a fact and must therefore be condemned as a violation

of the requirement of Rule 11 that the factual allegations in a document have evidentiary support.

### Fair Enforcement of Rule 11

　　　In recognition of the concern that overzealous enforcement of Rule 11 will deter vigilant

8

and creative advocacy, I must state the following.  I am not condemning the nature of the legal

arguments made by Karl, rather that the statements made in support of those arguments were

false.  It is fatuous and insulting to the bar to suggest that good lawyers will not represent their

clients diligently because they are sanctioned when they misstate and misrepresent the record.

Finally, it is hardly unfair to hold a lawyer to the professional standards of his peers by requiring

only that he do what any lawyer would consider objectively reasonable.

**Evidentiary Standard**

Finally, in a given case, it might be appropriate to ascertain what evidentiary showing is

necessary, choosing in traditional fashion between preponderance of the evidence and clear and

convincing evidence.  In this case, the choice is unnecessary.  I am dealing with exhibits and

transcripts, rather than the testimony of witnesses whose credibility I would have to assess.  I can

therefore say with perfect certainty, by the clearest and most convincing of evidence, that Karl

has violated Rule 11 in the making of factual allegations that were false and that had no support

in the evidence.

I now turn to the statements themselves.  In each instance, I will once again identify the

statement that I found might violate the Rule and summarize why I so concluded in my first

opinion.[7]  I will then indicate whether Karl violated Rule 11 despite his explanation and

justification.  As in my earlier opinion, I will place the statements at issue in italics.

A.      Interview Notes

The actual notes of the members of the panel that interviewed the candidates were

---

[7] I will refer to the Memorandum Opinion I issued in this case on September 28, 2004, docketed as number 61, as "Op."

exhibits to <u>Defendant's Motion for Summary Judgment</u>.  Plaintiff said of these notes:

"*Examination of the interview notes certainly supports a finding that Ms. Berry was given the interview questions and appropriate answers in her possession prior to her interview*."
<u>Plaintiff's Opposition to Defendant's Motion for Summary Judgement</u> ("Plains. Opp. MSJ") at 7.
In my earlier opinion, I indicated that I had reviewed the notes and that there was not a word in them that suggested, let alone, established to a certainty that Berry was given the interview questions before her interview. Op. at 4.

In response, Karl indicates that he did not intend to suggest that the interview notes contained direct evidence that Berry was given the questions before the interview. Plains. Response at 16.  He admits that "he imprecisely stated his argument regarding the interview notes [and that he] should have made clear that these notes, taken in tandem with the foregoing facts of record, could support the ultimate conclusion following a trial that Ms. Berry was artificially 'well prepared' for the interview." <u>Id.</u> at 21.

But, it is one thing to say that if one looks at the notes, one would certainly see that Berry had the questions and answers beforehand and another to say that, if one saw the notes and saw how well Berry did in conjunction with all the other evidence bearing on her performance, one might draw the inference that she was so well prepared that she must have had the questions and answers in advance.  The latter is a inference that is based on a speculation; that one does well on an exam or in an interview may be explained by one's competence and honest preparation.  It is speculation to infer that because one did well, one must have cheated.

More to the point, Karl cannot seriously be suggesting that it is an "imprecision" to tell his reader that an examination of the notes will show to a certainty that a fact is true when he

meant to tell his reader that if he looks at those notes and all the other evidence, he might be able to draw the inference that Berry did so well that she must have had the questions in advance.  A conclusion drawn from the physical examination of an object cannot be equated with an inference drawn from the examination of that object and from the consideration of all the other evidence that supports the drawing of that inference.  Equating what counsel claims is a fact–that the notes show that Berry had the questions–with a series of inferences drawn from all the other evidence (including the notes) is the very vice condemned as sanctionable conduct in the cases I have just reviewed.

B.      Requirements for the Position

In my original memorandum, I pointed out that plaintiff had propounded an interrogatory that demanded to know why the requirements for the Management/Program Analyst position did not require an advanced education or a college degree. Op. at 4-5.  I noted that the government's response was that the requirements for this position were derived "from the Qualification Standards for General Schedule Positions promulgated for government-wide use by the Office of Personnel Management (OPM Qualification Standards)." Id. at 5 (quoting defendant's response to Interrogatory No. 8).  Hence, the government explained that since the Qualification Standards stated no education requirement for the position at issue, "no such [educational] requirement could be, or was in fact, stated in the referenced vacancy announcement." Id.

Despite that question and answer, Karl wrote: "*The agency never explains why there was no educational requirement necessary to qualify for the promotion*." Plains. Opp. MSJ at 14.  Thus, although Karl had to know that the government had provided an explanation–that OPM government standards did not have such a requirement, and thereby prohibited it–he nevertheless

11

represented to his reader that the government had not provided any explanation whatsoever.  This is unquestionably a false statement.

Karl, conceding that what he wrote was imprecise and an overstatement, attempts to escape from what I consider a falsehood by indicating the he intended to say that "the agency never explains convincingly why the disparity in education between Lucas and Berry did not have a dispositive, or even significant, impact on the weighing or comparison of their respective qualifications." Plains. Reply at 8, 9, 11 (quoting Plains. Response at 21).  Karl's explanation only makes things worse.  That he intended to characterize the explanation given as being unconvincing means, of course, that he was aware of the explanation.  Yet, he told his reader that there was no explanation.  His "explanation" is therefore a concession of the falsehood he uttered.

C.      Fairley's Modification of the Knowledge, Skills, and Abilities ("KSA's")

The KSA's were modified to uniformly reduce the value of all the criteria by 0.5 in order to permit the addition of a new category for evaluation: knowledge of the strategic planning process. Op. at 6.

Karl said of this process: *"Dr. Fairley directed that the requirements of the job, the Knowledge, Skills and Abilities ("KSA's) be watered down.  At Dr. Fairley's direction, the objective requirements, the KSA's for the job, were changed to de-emphasize the knowledge requirement in order to make Ms. Berry appear to be qualified*." Plains. Opp. MSJ at 14.  Thus, the accusation against Fairley is that he purposefully corrupted the process to aid Berry.  But, as

the government correctly points out,[8] to accuse Fairley of engineering the result in order that

Berry appear more qualified than plaintiff would be to believe that Fairley knew that: (1) Berry

would apply, and (2) Fairley, motivated by an intent to favor Berry, changed the factors to help

her.  There is, of course, no evidence that the two enumerated facts were true and as a result,

Karl's accusation that Fairley intended to aid Berry by modifying the KSA's has absolutely no

evidentiary foundation.[9][12]

Karl's explanation is that he thought, through deductive reasoning, that the finder of fact

could readily reach the conclusion that Fairley watered down the factors to help Berry.  He states:

> When a selecting official who is believed to have a particular
> candidate in mind for a job dilutes objective factors that otherwise
> would disfavor that candidate and instead adds subjective factors
> that could help her that something is amiss.

Plains. Response at 22.

He then points to the statement by Ann York that she told Fairley to look out for Berry.

Id. at 23.  Since, in Karl's view, the factor Fairley added to the KSA's–knowledge of the strategic

planning process–was "fuzzy," the finder of fact could conclude that Fairley purposefully

changed the factors to aid Berry. Id.

But, it is one thing to assemble in logical order the facts–that Fairley changed the factors,

how he changed them, and that Ann York told Fairley to watch out for Berry–and then argue

there is a genuine issue of material fact as to whether Fairley's explanation for the change is

---

[8] Defendant's Response to John Karl's Response to Order to Show Cause ("Defs. Response") at 9-10.

[9] Karl dismisses the words "watered down" as "rhetorical." Plains. Reply at 12.

truthful.  If the inference is drawn that Fairley's explanation is false, it might then permit the

inference that the falsity of the explanation shows that the change of the factors was really a

pretext for discrimination.  Surely, any reasonable person, let alone a lawyer, sees the difference

between stating as fact that Fairley watered down the standards to help Berry, and assembling an

argument that explains why a finder of fact might conclude that the explanation Fairley gave for

the changes he made is not worthy of belief and therefore pretextual.  Karl's explanation is that

he was making a "fair argument" as to why Fairley watered down the criteria. Id. at 24.  Thus, he

refuses to even acknowledge the difference between making an argument that the explanation

Fairley gave for what he did is not true and stating as fact that Fairley corrupted the process to aid

Berry.

D.     Review By the Personnel Specialist

        The government proposed that there was no genuine issue as to the following material

fact:

> 11.     The personnel specialist assigned to this vacancy selection,
> Verna Braxton, reviewed each candidate's SF-171 to
> develop the Certificate of Eligibles and gave Ms. Berry the
> highest score of any candidate based upon the KSA's for
> the position.  See Rating Sheets (Ex. 19).

Defendant's Rule 7.1(m) Statement of Material Facts Not In Dispute ¶ 11.

        Plaintiff responded:

> 11.     Plaintiff disagrees with this statement of DSMF.[10]  Plaintiff
> has no knowledge as to whether or not Ms. Braxton
> actually reviewed each candidate's SF-171, or the reason, if
> any, Ms. Braxton allegedly gave Ms. Berry the highest

---

[10] Obviously an acronym for Defendant's Rule 7.1(m) Statement of Material Facts Not In
Dispute.

14

score.  The documents, in the absence of testimony from
Ms. Braxton, are insufficient to support this statement. In
view of the watered down job requirements, including the
failure to require even a college degree for this position,
and the absence of any showing that Ms. Braxton has any
qualifications necessary to rank the candidates, or any
knowledge of the job requirements for the Electronic
Library position previously held by Ms. Berry, Ms.
Braxton's observation are entitled to no weight. Plaintiff's
Ex. 18, Verna Braxton Deposition.

Plaintiff's Statement of Material Facts in Dispute and Material Facts Omitted by Defendant ("Plains. Facts") ¶ 11.

During her deposition, Verna Braxton, the personnel specialist assigned to the selection,

responded to a specific question by stating that she reviewed the applications of the candidates,

the "171's." Op. at 7.  Nevertheless, Karl stated: "Plaintiff has no knowledge as to whether or not

Ms. Braxton actually reviewed each candidate's SF-171." Plains. Facts ¶ 11.  Karl, the author of

that statement, said that his client had no knowledge of a fact that Karl himself knew–that

Braxton testified that she had reviewed the 171's. Plains. Response at 25.

 Karl, while admitting a mistake in drafting,[11] justifies telling his reader that his client did

not know what Karl knew by stating that "there is no requirement that the opponent of a

summary judgment motion accept what a witness says, especially one working for the opponent."

Id.  Indeed, he may, but he still owes his reader the fundamental honesty of conceding that the

witness made a statement under oath before he quarrels with it.  His not doing so was mistaken

and improper, albeit not of the magnitude and seriousness of the other statements that have so

troubled me.

---

[11] "Mr. Karl is obliged to be candid with the Court and he admitted to a mistake in
drafting. This instance plainly was one where judicious editing and more reflection would have
saved a lot of time.  But Mr. Karl did not act in bad faith." Plains. Reply at 16.

E.    Fairley's Refusal to Cooperate

Fairley testified that, when he was interviewed by the EEO investigator, he indicated that, while he would turn over the notes of his interview with plaintiff, he had been advised by the Office of General Counsel, there were "privacy questions" that prevented him from releasing the other candidates's answers. Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Defs. Reply MSJ"), Exhibit 1 at 14-15.  In a memorandum, the EEO investigator stated that Fairley was asked to respond to interrogatories but failed to do so. Plains. Opp. MSJ at Exhibit 16.  The Investigation Report, later filed by the EEO investigator, quotes Fairley as having explained to the investigator the OCR hiring process and why he made the selection he did. Id.  Furthermore, after consulting with General Counsel, Fairley turned over the notes of his interviews with the other candidates. Defs. Reply MSJ, Exhibit 7 at 2.

As the risk of being simplistic, it can be said that the following facts are true: (1) an EEO investigator notes that Fairley, despite a request, failed to answer interrogatories; (2) Fairley turned over his notes of his interviews with plaintiff to that investigator; (3) General Counsel initially advised Fairley that he might not be able to turn over the notes of his interviews with the other candidates; and (4) ultimately, General Counsel concluded that Fairley could turn over his interview notes and Fairley did so.

Nevertheless, Karl stated: *"Dr. Fairley refused to respond to the interrogatories from the EEO investigator and refused to turn over the notes during the first stages of the administrative process.*" Plains. Opp. MSJ at 26.

First, Fairley did not refuse to turn over "the" notes if the word "the" means the notes of his interviews of plaintiff and the other candidates.  He immediately handed the notes of his

interview with plaintiff to the EEO investigator. Defs. MSJ, Exhibit 8 at 15.  Second, he did not

refuse to give the other notes in the common sense of the word "refuse," *i.e.*, the expression of an

unwillingness to act.  Instead, he was told by his counsel not to turn them over. Id. at 22.

Fairley's not turning them over was not the result of an independent unwillingness to turn them

over but of an obligation imposed by counsel.  Third, it is a horrible half-truth to tell the reader

that Fairley refused to turn over the notes but then not tell the reader why and then how the notes

were turned over.

Finally, we do not know that Fairley refused to respond to the interrogatories.  We know

from the investigator's memorandum that at one point Fairley failed to answer but we do not

know whether he refused to do so, ignored the questions, or whether he simply forgot to answer

them.  To derive from his not answering the declaratory statement that he refused to answer them

states as a fact what may or may not be true.

In response, while admitting that his argument was "vigorous and perhaps not written as

clearly as it might have been,"[12] Karl excuses what he did by indicating that he is permitted to ask

his reader to draw an inference.  He abandons justifying his assertion that Fairley refused to

produce his notes.  Instead, he indicates that the EEO investigator wrote a memorandum to the

effect that Dr. Fairley had not been fully responsive.  He then states:

> Mr. Karl believed that there had to be a reason that the investigator
> went to the trouble.  As he saw it, the finder of fact could
> ultimately view Dr. Fairley's omission as some evidence of foot
> dragging and from that could conclude that Dr. Fairley might have
> had a motive not to provide answers to the interrogatories.

Plains. Response at 30.

---

[12] Plains. Response at 31.

First, I am afraid that Karl's counsel has caught Karl's disease.  The EEO investigator simply noted that Fairley "failed to provide responses to the interrogatories."[13]  He never said anything about Fairley's providing answers that were not fully responsive.  Second, it is one thing to accuse a person of refusing to provide information, as Karl did.  It is quite another to say that his failing to respond to interrogatories is evidence of a reluctance to do it and that the finder of fact may therefore deduce from that reluctance some motive not to answer.  That Fairley refused to hand over the notes and that he refused to respond to the interrogatories–are both declaratory sentences.  That one might deduce a motive from those statements is merely an argument.  That Karl defends himself on the grounds that the two are the same thing establishes just how little he understands the obligations that Rule 11 imposes.

The government contends that plaintiff ultimately admitted that Fairley appeared to be taking contemporaneous notes. Defs. Response at 12.  Plaintiff claims that Fairley took no notes during the twenty minute interview. Plains. Response at 27.  Assuming, for the sake of the argument, that a finder of fact would someday conclude that Fairley did not take contemporaneous notes, the following statement by Karl is sanctionable:

> *There is circumstantial evidence sufficient to create an inference that the interview notes were manufactured after the fact to justify a decision previously made on discriminatory grounds.*

Plains. Opp. MSJ at 26.

The statement insists that it is objectively true that there is circumstantial evidence that justifies the inference that Fairley did not take contemporaneous notes but created notes after he made the decision to hire Berry in order to hide the fact that he favored Berry because she was

---

[13] Id. at Exhibit 16.

18

younger than plaintiff.

But, there are only three possibilities: (1) that Fairley took contemporaneous notes; (2)
that Fairley created the notes after the interview; and (3) that Fairley did not create any notes
either contemporaneously or after the interview.  The only evidence, circumstantial or otherwise,
that Karl points to is what Karl's lawyer calls Karl's client's "opinion that no notes were taken
during the interview." Plains. Response at 37.  Karl's lawyer then reasons:

> If Mr. Lucas' testimony is credited, it is a fair inference that Dr.
> Fairley's notes were made later on.  Then, the finder of fact could
> conclude from the face of Dr. Fairley's interview notes that it is
> unlikely that a selecting official would not take notes during the
> interview but yet be able to write such detailed notes afterwards.

Id.

To parse that more carefully, one would have to say that: (1) from the premise that Fairley
did not take notes contemporaneously follows the conclusion that he created notes after the
interview: (2) from the premise that those allegedly non-contemporaneous notes are detailed
follows the conclusion that it is unlikely that a person who did not take contemporaneous notes
could take such detailed notes; and (3) from all of this flows the conclusion that "the interview
notes were manufactured after the fact to justify a decision previously made on discriminatory
grounds." Id.

That line of "reasoning" has as much substance as a house of cards.  Thanks to this fallacy,
it is permissible, in Karl's view, to equate a fact–that Fairley did not take contemporaneous notes–
with a conclusion–that Fairley concocted notes afterwards to hide his preference for Berry because
she was younger than plaintiff.

F.      The Destruction of Documents

In my original memorandum, I explained how, in a separate opinion denying plaintiff's motion *in limine*, I had concluded that there was no evidence whatsoever that there are or were any documents criticizing plaintiff, let alone any evidence that they were destroyed. Op. at 10. Yet, Karl made the following statement:

> [S]ince the agency destroyed the documents allegedly criticizing Mr. Lucas, the court should bar any oral testimony where the underlying documents were destroyed. The agency must have destroyed these documents in order to deprive Mr. Lucas of the opportunity to cross examine witnesses regarding those alleged complaints.

Plains. Opp. MSJ at 24.

In response to the order to show cause, he marshals the evidence that calls into question whether there were any such complaints but does not even attempt to defend his assertion that the agency destroyed documents.[14]   Instead, he states the following:

> Given the inconsistencies in Dr. Fairley's account about purported problem with Mr. Lucas and what had been discarded and when or whether anything pertinent had been thrown out . . . Mr. Karl believed there was a basis to argue that the finder of fact could infer that the claim of people complaining about Mr. Lucas was overblown, if not entirely ersatz.

Plains. Response at 34.

Karl offers this explanation as a justification for his drawing an inference that there was

---

[14] Note that during his deposition, Fairley, who had by then retired, indicated that he had taken one personnel folder, unrelated to this case, home. Plains. Response, Exhibit 7 at 7-8.  He also thought that he had a folder relating to this case but found that he did not.  Initially, he testified that it was trashed when he retired. Id. at 8.  When the deposition resumed after lunch, Fairley indicated that, contrary to what he had first said, he did have a file containing material as to his selection of the replacement for the director of the resources management group and that he had given that file, including material relating to plaintiff's application for that position, to the General Counsel. Id. at 129-30.

reason to disbelieve that people had complained about plaintiff.  But, there is a gap the size of the

Grand Canyon between the permissibility of drawing the inference that the complaints about

plaintiff were exaggerated and stating as fact that there were documents pertaining to those

complaints and that the agency destroyed them.  Karl concedes as much.  He states of his

assertion that the agency destroyed documents criticizing his client "was not adequately

supported by the record." Plains. Reply at 25.

G.    Admission by Berry

        Plaintiff persistently complains that Berry lacked the fundamental qualifications for the

position: "*Ms. Berry also admits that she lacked a comprehensive knowledge of the workings of*

*the OCR Electronic Library, despite defendant's assertion to the contrary.*" Plains. Facts ¶ 38.

As Karl's Response to Order to Show Cause makes clear, that statement is based solely on

Berry's testimony, described in my original opinion (Op. at 11), that she was not invited to some

of the meetings because representatives of the enforcement offices attended them and the topics

of these meetings were technical.

        There is a substantial difference between indicating to the reader that Berry answered a

specific question (Do you have a comprehensive knowledge of the Electronic Library?) in the

negative and her stating that she did not attend certain meetings because the topics were more

technical.  Karl dismisses the difference between his stating that Berry lacked a comprehensive

knowledge of the Electronic Library and her stating that she did not attend certain meetings at

which technical matters were discussed as mere "hair splitting." Plains. Response at 34.

According to him, her not being conversant with the technical areas "that are important to the

efficient and full functioning of an agency office can, indeed, be fairly described as lacking

'comprehensive' knowledge." Id.  But, Berry was never asked and never spoke to her knowledge

of the Electronic Library; she spoke only to her not attending meetings at which technical matters

were discussed.  The only fair statement that could be made in summary of her testimony would

have been "Ms. Berry did not attend meetings at which technical matters were discussed."  There

is a giant gap between the truth of that statement and her supposed admission that she lacked

comprehensive knowledge of how the Library worked.  The latter statement specifically denotes

that she admitted that she did not have a comprehensive understanding of how the Library

worked and she never said any such thing.

H.      Fairley's Claim

        Fairley testified that he could not recall, with any degree of detail any complex work that

Berry was doing other than her work on the Electronic Library. Defs. MSJ, Exhibit 6 at 42.  He

also testified that the Electronic Library project was very complex and that Berry had the lead

role as acting project manager. Id. at 43-44, 76.

        Nevertheless, Karl made the following statement:

> Dr. Fairley was personally familiar with Ms. Berry's work on the
> Electronic Library through monthly teleconferences and never
> claimed her work was other than administrative or clerical.

Plains. Facts ¶ 59.

        As I pointed out in my original opinion, Fairley was never asked whether the nature of

Berry's work was administrative or clerical. Op. at 11-12.  Yet, the statement quoted suggests

that Fairley had an opportunity to express that opinion and either indicated that her work was

administrative or clerical or remained silent when the contention was advanced that her work was

administrative or clerical.  Neither of these events occurred but the statement states that one of

them did.  Worse, it disguised the reality that Fairley had specifically testified that Berry's work

on the Electronic Library was complex.

Karl's lawyer, conceding that Karl made a "good faith" error, indicates that:

> This assertion was a good faith error.  What Mr. Karl was seeking
> to convey was that the work that Dr. Fairley described as
> 'complex' which Ms. Berry had been doing actually was clerical
> and administrative in nature and that Dr. Fairley knew or had to
> have known that.

Plains. Response at 35.

I do not understand how it is "good faith" to tell one's reader that Fairley had an

opportunity to make "a claim" about the complexity of Berry's work, and that he never described

it as other than administrative and clerical.  This suggests that Fairley was provided such an

opportunity and that he made the positive statement that Berry's duties were administrative or

clerical, while keeping hidden from the reader the fact that he was never specifically asked

whether Berry's work was administrative or clerical.  To make the matter worse, Karl does not

tell his reader that Fairley specifically described the nature of Berry's work as complex when

asked.

I.     What Fairley Told Berry at Her Interview

Fairley interviewed Berry at 1:00 p.m. and plaintiff at 2:20 p.m. Plains. Opp. MSJ at

Exhibits 14,15.  In her deposition, Berry testified that during her interview, Fairley told her that

the interviewing panel had selected her and that he then congratulated her. Id., Exhibit 13 at 61.

Karl then asked her: " So, presumably, he was telling you at that time you got the promotion." Id.

Berry responded yes. Id.  Counsel then asked: "Did he make it sound like it was the panel's

decision or his decision?" Id.  She answered: "The panel's decision." Id.

On redirect, Berry indicated that, at the conclusion of her interview with Fairley, Fairley told her she was the first choice of the interviewing panel but did not tell her she had received the position. Id. at 77.  She further testified that she only learned that she actually received the position when she got a call from personnel. Id. at 78.  When Karl then asked her whether Fairley congratulated her at her interview, she responded: "He said the panel selected you; congratulations." Id. at 80.

This testimony demonstrates that a clear distinction can be drawn between what Fairley said and what Berry thought.  Although Berry's testimony on direct and on cross-examination suggests two possible scenarios–that Berry was told she got the job at the conclusion of her interview or that Berry was later told she got the job by the personnel office–the crucial point is that she never waivered from her testimony as to what Fairley said–that she was the panel's first choice.  Nevertheless, Karl stated:

> *Dr. Fairley told Ms. Berry at her interview that she had been selected for the position, even though she was interviewed more than an hour before Mr. Lucas.*

Plains. Facts at 78.

Berry never said that Fairley told her that she had been selected for the position.  The statement that he did is false.  Karl's lawyer states that:

> Ms. Berry agreed during her deposition testimony that Dr. Fairley told her at the end of her interview that "the panel select [sic] me and congratulations" which she admitted made it sound like she had gotten the promotion.

Plains. Response at 37.

In essence, Karl's lawyer concedes that Berry understood that Fairley was only

congratulating her on being selected by the panel and that the job was extended to her by the

personnel office after all the interviews.  Thus, regardless of what Berry assumed, the statement

by Karl that Fairley told Berry that she had been selected for the position is demonstrably false.

Berry testified unequivocally that Fairley congratulated her on being selected *by the panel*.

J.    Whether the Panel's Decision was Unanimous

Gloria Butler, a member of the selection panel, signed a memorandum that stated that it

was the panel's "unanimous recommendation that Jerelyn Berry receive the promotion." Defs.

MSJ at Exhibit 14.  She also testified that the panel never had a final meeting as was the

customary practice and that she may have been out of the office on flextime or sick leave on the

day the panel met. Plains. Opp. MSJ, Exhibit 6 at 29.  When she asked if she had given the other

members her proxy to decide who should be the winning applicant, she said: "I did. I did. I really

did." Id.

Despite this testimony, Karl asserted that there was no genuine issue of material fact as to

the following propositions:

> 93.    Following the selection of Ms. Berry, the panel signed a
> document stating that the decision of the panel was
> unanimous in its selection of Ms. Berry. (Defendant's Ex.
> 14).
>
> 94.    However, *Ms. Butler stated the decision of the panel was
> not unanimous*. (Plaintiff's Ex. 1, ¶ 65, Gloria Butler
> Deposition, pp. 18-19; Defendant's Ex. 24, p. 6). "We
> never had a final meeting for the four of us to come
> together and make a final recommendation as a four
> member team" or discuss what constituted the best answers.
> (Plaintiff's Ex 6, Gloria Butler Deposition, pp. 18, 49;
> Defendant's Ex. 24, p. 10).

Plains. Facts ¶¶ 93-94.

Since Butler never said that the decision of the selection panel was not unanimous, the statement was false. Karl's lawyer concedes that "Mr. Karl should have expressed more clearly that he thought the interview panel never made any true 'decision' on the merits of the promotion," but he then states:

> However, Mr. Karl asserts that Ms. Butler did swear that she did not see the word "unanimous" when she signed the memorandum, and that Mr. Karl was entitled under the summary judgment cases to accept what Ms. Butler has to say under oath.

Plains. Response at 39.

The cure is worse than the disease. From the proposition that Butler did not see the word unanimous before she signed the memorandum hardly flows the fact that she ever stated that the decision of the selection panel was not unanimous, but that is what Karl insists. To the precise contrary, Butler specifically testified that she knew that by signing the document she was agreeing to the recommendation of the panel that Berry should get the job. Plains. Response, Exhibit 5 at 37. Thus, an accurate statement of her testimony would be that she signed a document indicating that the decision of the panel was unanimous, that she did not see the word unanimous in it when she signed, and that she thought that she was signing a document that indicated only that she was on the panel but that she had given her proxy to the other members. Op. at 15-16. That is not even close to Karl's unequivocal statement that she specifically indicated that the decision of the selection panel was not unanimous.

K.    Whether Besner tried to Intimidate a Union Official

During the EEOC proceedings, a woman named Lucinda Powell stated under oath that she heard Berry thank another employee, Art Besner for the help he had given her (Berry) and

that Besner replied that he was glad to help. Defs. MSJ at Exhibit 28.  Once Besner learned of

what Powell said, he wrote a letter to a union official stating that character assassination was

illegal and expressing his hope that the EEOC proceedings provided for disciplinary action for

those who made false statements. Plains. Opp. MSJ at Exhibit 11.  Of this event, Karl stated:

"*Mr. Besner tried to intimidate plaintiff's union representative, Ben Miller, about plaintiff's*

*complaint in this matter*." Plains. Facts ¶¶ 93-94.  Karl now concedes that this statement is in

error; he meant to say that Besner tried to intimidate Powell and I will accept that as a fair

characterization of the letter Besner wrote to Miller.

L.      Besner's Assistance to Berry

        Karl indicated that there was no genuine issue of material fact that Besner gave Berry the

actual interview questions in advance of her interview and that plaintiff and Lucinda Powell

heard Berry thank Besner for giving Berry the questions and telling her how to prepare for the

interview.  Specifically, Karl stated:

> 85.     *Ms Berry received the interview questions and coaching
>         from Art Besner **prior**[15] to her interview. (Plaintiff's Ex. 1 ¶
>         61; Defendant's Ex. 28, December 1999 Declaration of
>         Lucinda Powell; Defendant's Ex. 24, pp. 3, 6, 11-12;
>         Plaintiff's Ex. 4, Response to Interrogatories of Theodore
>         R. Lucas in 1999 EEO Investigation*)

> 86.     *Both Mr. Lucas and Ms. Powell heard Ms. Berry thank Mr.
>         Besner for giving her the interview questions prior to the
>         interview and telling her how to prepare for the interview.
>         Id. Defendant's Ex. 28; Plaintiff's Ex. 1 ¶ 62; Plaintiff's
>         Ex. 5, Theodore R. Lucas Deposition, pp. 27, 140-144). Mr.
>         Lucas heard Mr. Besner tell Ms. Berry that he "hoped" he
>         "helped her" prepare for the interview, and Ms. Berry
>         replied that he did, and "thank you very much." (Plaintiff's*

---

[15] Emphasis in original.

*Ex. 1, ¶ 62; Plaintiff's Ex. 5, Theodore R. Lucas*
*Deposition, pp. 140-144).*

Plains. Facts ¶¶ 85, 86.

I have included the record citations because they are crucial to the analysis.  They consist

of statements by plaintiff and Powell in which they state unequivocally that Besner gave Berry

the questions in advance and that Berry was overheard thanking Besner for providing her with

the interview questions prior to the interview.

Since Karl cited only the unequivocal statements in his client's answers to interrogatories

or declarations and Powell's statement that Berry thanked Besner for "his assistance in giving her

the information he had given her *prior to the interview,*"[16] the reader is led to believe that it is not

even in dispute that Besner gave Berry the interview questions, that Berry thanked him for doing

so, and that his client and Powell so stated.  Karl keeps from the reader the following information

that Karl had to know but did not disclose:

1.      Jan Gray testified that the selection panel was dissatisfied with the questions

        Besner had drafted, that Gray rewrote them, and that it was Gray's questions, not

        Besner's, that were used during the interview. Defs. MSJ at Exhibit 20.  During

        his deposition, Besner was actually shown the questions used during the interview

        and indicated that they were not the questions he had drafted. Id. at Exhibit 27.

        Thus, it was impossible for Besner to have given Berry the interview questions in

        advance.  Gray drafted them, not Besner.

2.      There are serious inconsistencies in plaintiff's testimony that undercut his

---

[16] Defs. MSJ, Exhibit 28 ¶ 3.

unequivocal statements, cited in support of paragraphs 85 and 86, that he actually

heard Berry thank Besner for giving her the questions.  See Op. at 19-20 where I

analyze these inconsistencies.

3.      Lucinda Powell was asked to sign a declaration in which she was asked to state

that she heard that Berry had the questions. Defs. MSJ at Exhibit 32.  She refused

to sign the declaration and explained in her deposition that she did not hear Berry

say that she had been given the questions. Id.

Thus, the reader is never told about the information that, at the barest minimum, indicates

that there are serious reasons to doubt the truthfulness of the assertion that Besner gave Berry the

questions: the inconsistencies in plaintiff's testimony and Besner's insistence, confirmed by

Gray, that Besner's questions were not the ones used in the interview.  Instead, the reader is told

that it is not even in dispute that Besner gave Berry the questions.  Most significantly, the reader

is given a citation to Powell's signed declaration in support of the contention that Besner gave

Berry the questions but is not told that Powell specifically excised those very words from a draft

declaration.

Karl's justification for this is to first cite materials other than the ones he originally cited

in support of the statement that Besner gave Berry the questions.  Thus, after the fact, he argues

that the record, other than the portions he cited, can be read to indicate that the panel used some

of Besner's questions. Plains. Response at 42.  Karl argues that support is found in the testimony

of Powell that after the selection was made, a team leader named Baker assembled the GS-12's

and handed out copies of the interview questions, noting that "Art [Besner] had developed them."

Plains. Response, Exhibit 11 at 25.  Karl also states that Powell indicated that she was not asked

29

most of these questions. Id. at 26.

Baker's statement, that Besner had written the questions, as recounted by Powell is

hearsay, and is, of course, contradicted by Besner and Gray.  Moreover, that Powell testified that

most of the questions were new to her and not asked at the interview confirms what Besner and

Gray said: that Besner drafted questions, that Gray revised them, and that Gray's version of the

questions was the one used.  In any event, and no matter how this information is ultimately

refined, Karl never relied on it in the first place but used only his client's and Powell's testimony

in support of his assertion.

As to Lucas's testimony, Karl's lawyer  insists that it was legitimate for Karl to oppose

the defendant's motion by "stating testimony that he or she believes to be accurate." Plains.

Response at 44.  According to Karl's attorney, "[t]he system is geared towards the other side's

pointing out any inconsistencies or vagueness and the trial judge then deciding whether genuine

issues of material fact require a trial." Id.  Karl's attorney adds that there is nothing wrong

therefore in an advocate "opposing a summary judgment motion by stating testimony that he or

she believes to be accurate." Id.  Finally, he points to Lucas's testimony during the EEO

administrative hearing that he overheard Berry thank Besner for telling her what to study. Plains.

Response at 44 (quoting EEO Administrative Hearing Transcript at 83-85).

This analysis is little short of astonishing.  Karl stated that it was undisputed that Besner

gave Berry the interview questions and in support of that argument, cited his client's unequivocal

statement that he heard Berry thanking Besner for giving her the questions.  Karl never made any

reference whatsoever to his client's other testimony, upon which he now relies ("thank you for

telling me what to study"), to justify his advocacy.  Thus, Karl justifies his statement that is was

undisputed that Besner gave Berry the notes by abandoning his client's testimony to that effect. It does not even occur to him that the testimony upon which he now relies contradicts the testimony upon which he first relied.

Finally, Karl's lawyer brushes over the fact that Powell "excised" the word question from her declaration (Plains. Response at 42), but ignores the simple reality–that Karl quoted Powell in support of a proposition, that Besner gave Berry the questions in advance, that Powell specifically denied having avowed.

Once again, Karl's justifies this as nothing more than the drawing of permissible inferences from the facts.  His explanation is so emblematic of his obliteration of the difference between stating a fact and explicitly drawing inferences that it must be quoted at length:

> In 1999, Ms. Powell told Mr. Karl that Ms. Berry had thanked Mr. Besner for help with the questions. Given Ms. Powell's testimony. Mr. Karl justifiably argued that Mr. Besner had helped Ms. Berry before the interview and that he had imparted "information" that Ms. Berry thought had been beneficial to her.  Since Ms. Berry had successfully answered a series of questions at the interview, it also was fair for Mr. Karl to have believed that the information that Besner had provided included some questions, for the finder of fact could, after hearing the witnesses' live testimony, conclude that such an advantageous and unfair transfer of information had in fact occurred.

> Maybe Mr. Karl should have used the term "information" instead of "question"; there *is* direct evidence that Ms. Berry thanked Mr. Besner for giving her "information." And Mr. Karl should have written that the finder of fact could infer from Ms. Powell's testimony that Mr. Berry likely was referring to "questions" when Ms. Powell (and as we shall see, Mr. Lucas) attest that Ms. Berry thanked Mr. Besner for helping her with the information and telling her what to study.

> The word "question" was not used in bad faith or with the intent of flouting the Court's authority.  Mr. Karl was acting as a zealous

31

advocate and wasn't trying to hoodwink the court.

Plains. Response at 42-43.

The problem with Karl's advocacy is simple.  Karl thinks that a zealous advocate may: (1) tell a judge that it is undisputed that the incumbent received the interview questions in advance when what is undisputed is merely that one individual overheard the incumbent thanking another individual for information; (2) keep from the judge the inconsistencies in one own's client's testimony as to a crucial fact; and (3) keep from the judge the fact that a witness excised from her declaration the very words that the "zealous advocate" attributes to her.  If this is zealous advocacy, the angels must weep.

### The Penalty to Be Imposed

The sanction imposed because of the Rule 11 violation must be based on the costs actually incurred as a result of that violation.  It must also be sufficient to deter others from engaging in similar behavior.[17]  See United States v. Wallace, 964 F.2d 1214, 1221 n.6 (D.C. Cir. 1992) (award of costs under 28 U.S.C. § 1927 inappropriate because *inter alia* no reliable measure of costs judicial system incurred because of sanctioned behavior).  Cf. Bonds v. District of Columbia, 93 F.3d 801, 808 (D.C. Cir. 1996) (sanction must be proportionate to wrong done, considering prejudice to other party and court and need to deter similar misconduct in the future); Shepherd v. American Broad. Cos., Inc., 62 F3d 1469, 1478 (D.C. Cir. 1995) (emphasizing that

---

[17] I note that Karl portrays himself as facing inexorable deadlines in submitting the documents he did.  Indeed, he says that "he was skippering virtually alone amidst heavy seas throughout 2003, and then sailed right into a gale." Plains. Reply at 1.  Despite the nautical drama, Karl knows that he could have moved for an enlargement of time and had it for the asking.  As every sailor knows, when it gets rough, shorten sail and be as careful as possible.  The last thing either a sailor or lawyer should do is to get reckless and submitting documents without taking adequate time to review them is as reckless as a lawyer can get.

the sanction imposed must be proportionate to misconduct).

The prevarications that haunt plaintiff's Opposition to the Motion for Summary Judgment have created a great and utterly unnecessary burden upon government counsel, who has had to file a response to the Order to Show Cause.  That unnecessary expenditure of the taxpayers' money cannot be compensated by my awarding attorney fees in the government's favor because such fees may not be awarded when the court acts without a government motion under Rule 11 and *sua sponte*.  Unfortunately, that is not the only expenditure of time for which the taxpayers must pay.  I had to write the initial Memorandum, justifying the original order to show cause, and have written this second Memorandum explaining why I am imposing the penalties I am.  It has been demanding work since I have constantly had to refer to the record in analyzing each statement that I have found objectionable.  A fair penalty would attempt to recover for the taxpayers the cost of my time.  As a United States Magistrate Judge, I earn about $150,000 per year.  If one assumes that I take two weeks vacation and work a forty hour week, I am paid $75 an hour.[18]  I can assure my reader that I have spent much more than one full working week in preparing the two memoranda to which I referred.  Nevertheless, I will exercise my discretion and impose a monetary sanction of $3,000 upon Karl, representing 40 hours or one week of my time at $75 per hour.

I fear, however, that this monetary sanction is inadequate.  Karl will claim roughly $390 per hour for his services in this and every other Title VII case he handles,[19] meaning, of course,

---

[18] I appreciate that this understates what it costs the United States to employ me since I have health and life insurance and other benefits.

[19] Karl can be expected to claim the "Laffey" rate of $390 of his services.  The "Laffey" rate is based on the hourly rates (now adjusted for inflation) allowed by this Court in Laffey v.

that he demands approximately $3,120 per day for his services.  At that rate, the $3,000 is just

about one day of his time, compared to the $3,000 the taxpayers paid me for the week I had to

spend writing these opinions, I am firmly convinced that the $3,000 is an inadequate sanction to

deter him and others from the behavior that I have had to condemn.  Accordingly, I am also

referring him, by a separate order, to this Court's Committee on Grievance for a determination as

to whether his behavior is worthy of disciplinary sanction.

      An Order accompanies this Memorandum Opinion.


_____

Dated:                                                    _____
                                                          JOHN M. FACCIOLA
_____                                 UNITED STATES MAGISTRATE JUDGE


____

_____

Northwest Airlines, 572 F. Supp. 354 (D.D.C. 1983), aff'd in part and rev'd in part on other
grounds, 746 F.2d 4 (D.C. Cir. 1984), cert denied, 472 U.S. 1021 (1985).